## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI SOUTHERN DIVISION

SAMYNTHIA BENETIZ,    )
           )
    Plaintiff,   )
           )
  vs.       )   Case No. 6:23-cv-03207-SRB
           )
NEW PRIME, INC.,    )
           )
    Defendant.  )

## DEFENDANT'S SUGGESTIONS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW defendant New Prime, Inc. ("Defendant" or "Prime"), and respectfully submits its Suggestions in Support of its Motion for Summary Judgment on the Claims of Plaintiff Samynthia Benitez ("Plaintiff" or "Ms. Benitez").

       Respectfully submitted,

       ELLIS ELLIS HAMMONS & JOHNSON, P.C.

       By  /s/  *Tina G. Fowler*
        Tina G. Fowler
        Missouri Bar No. 48522
        tfowler@eehjfirm.com

        Rachel A. Riso
        Missouri Bar No. 57145
        rriso@eehjfirm.com

        1901C South Ventura
        Springfield, Missouri 65804
        Telephone: (417) 887-0133
        Facsimile (417)887-8740
        Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………..……iii

I.      STATEMENT OF UNDISPUTED MATERIAL FACTS…. ..…………………..……1
        Background Facts, Prime's Management, Policies and Driver Training Programs…...…1
        Benitez's Allegations Against Thompson..………………………………………………4
        Benitez's Anonymous Reports Regarding Thompson..…………….…..……………...…6
        Prime's Response Once Benitez Identified Herself..……………………………………8
        Mosley's Investigation of Benitez's Allegations Against Thompson…..………………11
        Thompson's Termination and Benitez's Additional Allegations Against Thompson…..13
        Benitez's Training with Rebecca Aguirre……....……………………………………….14
        Prime's Termination of Benitez's Training……………….…..…………………………19
        Communications Between Legal Counsel…………………………………………….…21
        Benitez's Claims………………………....………………………………………………22

II.     STANDARD OF REVIEW..……………………………………………………..…22

III.    ARGUMENT…………………..……………………………………………….…..23

        A.  BENITEZ CANNOT SHOW THAT SHE WAS SUBJECTED
            TO A SEXUALLY HOSTILE WORK ENVIRONMENT………………..……….23

            1.  Benitez cannot establish element four, that the alleged harassment
                affected a term, condition, or privilege of employment………………..…….….23

            2.  Benitez also cannot show element five, that Prime knew or should have
                known of the alleged harassment and failed to take proper action……………........27

        B.  BENITEZ'S TITLE VII RETALIATION CLAIM FAILS……..……………….…..30

            1.  Benitez cannot show that her alleged protected activity was
                the but-for reason for the termination of her training………………….…...….…30

            2.  Even if Benitez established her prima face case of retaliation,
                which Prime denies, Prime meets its burden of articulating a
                legitimate, nonretaliatory reason for its actions under
                the second step of *McDonnell Douglas*…..…………………………………..…32

            3.  Benitez cannot show that Prime's asserted reasons were a
                mere pretext for discrimination under the last step of
                *McDonnell Douglas*…………………………………………………….…..32

IV.     CONCLUSION.……………………………………………………………….……35

**<u>TABLE OF AUTHORITIES</u>**

**<u>Cases</u>**

*Banford v. Bd. of Regents of Univ. of Minn*., 43 F.4th 896 (8th Cir. 2022)………………....………32

*Carrington v. City of Des Moines*, 481 F.3d 1046 (8th Cir. 2007)………………………..………34

*Cheshewalla v. Rand & Son Constr*., 415 F.3d 847 (8th Cir. 2005)…………………………..………28

*City of Mt. Pleasant v. Assoc. Elec. Coop*., 838 F.2d 268 (8th Cir. 1988)……………………………22

*Couch v. Am. Bottling Co*., 955 F.3d 1106 (8th Cir. 2020)……………………………………....………34

*Cross v. Prairie Meadows*, 615 F.3d 977 (8th Cir. 2010) )………………………………..………27

*Duncan v. General Motors Corp.,* 300 F.3d 928 (8th Cir. 2002)………………………………24

*EEOC v. CRST Van Expedited, Inc.,* 679 F.3d 657 (8th Cir. 2012)……………………………....23, 28

*Eich v. Bd. of Regents for CMSU*, 350 F.3d 752 (8th Cir. 2003)……………………………..………26

*Faragher v. City of Boca Raton*, 525 U.S. 775 (1998)……………………….……………………24

*Fercello v. Cty. of Ramsey*, 612 F.3d 1069 (8th Cir. 2010)……………………………………..………23

*Florido v. Heartland Beh. Hlth. Serv*., 2010 WL 4220498 (W.D. Mo. 2010)…………....………25, 29

*Gibson v. Geithner*, 776 F.3d 536 (8th Cir. 2015)……………………………………………..………33, 34

*Guimaraes v. SuperValu, Inc*., 674 F.3d 962 (8th Cir. 2012)…………………………….………..32

*Hairston v. Wormuth*, 6 F.4th 834 (8th Cir. 2021)………………………………………....………27

*Harris v. Forklift Sys., Inc*., 510 U.S. 17 (1993) …………………….…………………....………24

*Jackson v. St. Joseph State Hosp*., 840 F.2d 1387 (8th Cir. 1988),
*cert. denied*, 488 U.S. 892 (1988)…………………………………………………………34

*Jenkins v. Univ. of Minn*., 838 F.3d 938 (8th Cir. 2016)……………………………………....………26

*Jenkins v. Winter*, 540 F.3d 742 (8th Cir. 2008)……………………………………………..………28

*Kopp v. Samaritan Health Sys*., 13 F.3d 264 (8th Cir. 1993)…………..….……………….………26

*LeGrand v. Area Res. for Comm. & Hum. Serv*., 394 F.3d 1098 (8th Cir. 2005)………………….………24

*Liles v. C.S. McCrossan, Inc*., 851 F.3d 810 (8th Cir. 2017)……………………………………25

*Long v. Aramark Uniform & Career Apparel, Inc.*, 2005 WL 1006406 (W.D. Mo. 2005)……..…...22

*Lopez v. Whirlpool Corp.*, 989 F.3d 656 (8th Cir. 2021)………………………………....25, 27

*Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799 (8th Cir. 2019)…………...……………...30

*McMiller v. Metro*, 2010 WL 2696706 (E.D. Mo. 2010)…………………………………………22

*McNary v. Schreiber Foods*, 535 F.3d 765 (8th Cir. 2008)…………………………………………32

*Merritt v. Albemarle Corp.*, 496 F.3d 880 (8th Cir.2007)………………………………..……..28

*Nichols v. Tri-National Logistics, Inc.*, 809 F.3d 981 (8th Cir. 2016)…………………………….23

*Nitsche v. CEO of Osage Valley Elec.*, 446 F.3d 841 (8th Cir. 2006)………………………..……..27

*Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535 (8th Cir. 2020)…………………………24, 25

*Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000)……………………………………..……..32

*Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751 (8th Cir. 2001)……………………..……..…..23

*Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111 (8th Cir. 2018)………………………………32

*Shirrell v. St. Francis Med. Ctr.*, 24 F. Supp. 3d 851 (E.D. Mo. 2014)……………...………..30, 31

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)……………………………………..……..32

*Sutherland v. Mo. Dpt. of Corr.*, 580 F.3d 748 (8th Cir. 2009)………………………………….23

*Univ. of Tex. Sw. Med. Ctr. v. Nassar¸* 570 U.S. 338 (2013)……………………...………..………30

*Van Horn v. Best Buy*, 526 F.3d 1144 (8th Cir. 2008)…………………………………..……..30

*Vance v. Ball State Univ.*, 570 U.S. 421 (2013)……………………………………………...……..28

*Watson v. Heartland Health Lab.*, 2014 WL 1920432 (W.D. Mo. 2014)………………………….25

*Weger v. City of Ladue*, 500 F.3d 710 (8th Cir. 2007)…………………………………..……..27

*Weyers v. Lear Oper. Corp.*, 359 F.3d 1049 (8th Cir. 2004)…………………………………………28

*Wright v. St. Vincent Hlth. Sys.*, 730 F.3d 732 (8th Cir. 2013)………………………..……..…..33

*Yearns v. Koss Const. Co.*, 964 F.3d 671 (8th Cir. 2020)………………………………...……..33

*Zirpel v. Toshiba Am. Info. Sys.*, 111 F.3d 80 (8th Cir.1997)………………………..………..29

**<u>Federal Rules and Statutes</u>**

Federal Rule Civil Procedure 56………………………………………………………………..……22

42 U.S.C. § 2000e-2(a)(1)…………...……………………………………………………………………23

42 U.S.C. § 2000e-3(a)………………..……………………………………………………..……….30

## I.     STATEMENT OF UNDISPUTED MATERIAL FACTS

Prime respectfully submits the following undisputed material facts in support of its motion.

**Background Facts, Prime's Management, Policies and Driver Training Programs**

1.      In January 2022, Benitez began truck driver training, as a trainee for Prime, a trucking company, in Springfield, Missouri. *See* Deposition of Samynthia Bailey Benitez,[1] attached hereto as Exhibit A, p. 16, l. 19-25; p. 17, l. 1; *also see* Deposition of Brooke Mosley, attached hereto as Exhibit B, p. 6, l. 4-5.

2.      Benitez's first phase of training was orientation and classroom training, learning about matters that one should know before driving a semi-truck. Exhibit A, p. 17, l. 10-18.

3.      During orientation, Benitez learned of Prime's policies regarding anti-sexual harassment and nondiscrimination, and she received training regarding those policies, putting her on notice that Prime prohibited sexual harassment. Exhibit A, p. 18, l. 2-6 and l. 12-24; p. 19, l. 11-22; and Depo. Ex. 1; *also see* p. 32, l. 10-23, and Depo. Ex. 2.

4.      All drivers for Prime receive that same anti-sexual harassment and nondiscrimination training during orientation. Exhibit B, p. 20, l. 6-25; p. 21, l. 1-11.

5.      During orientation, all drivers receive a "zipped pouch" containing training materials including a copy of Prime's Non-Discrimination and Anti-Harassment Policy which states: "If you experience any job-related harassment…promptly report the incident to your Fleet Manager, Operations Managers, Security Department or the Legal Department…[or] the training staff and/or your recruiter. (These individuals can be reached through Prime's main phone number (417) 866-0001…(24) hours a day)." Exhibit B, p. 22, l. 9-25; p. 23, l. 1-11; Depo. Ex. 22.

6.      Prime also has a female driving program called "Highway Diamonds" that is administered by Prime's Female Driver Liaison, Brooke Mosley ("Mosley"), and Mosley presents

---

[1] Plaintiff's last name is spelled "Benitez." See Exhibit A, p. 5, l. 11-12.

to the drivers during orientation and discusses female safety on the road and provides a sheet to the drivers that gives Mosley's email and personal cell phone number as a point of contact. Exhibit B, p. 25, l. 2-25; p. 26, l. 1-17; Depo. Ex. 23.

7.      In addition to reporting alleged harassment to the fleet manager, operations managers, or the security or legal departments, Benitez knew she could also report it to Mosley, and Benitez had both Mosley's phone number and email through which she could do so. Exhibit A, p. 23, l. 14-17; p. 24, l. 19-23; p. 33, l. 7-14.

8.      Prime has several Operations Managers housed in its Springfield, Missouri terminal, one housed in its Scranton, Pennsylvania terminal, and one in its Salt Lake City, Utah terminal. Exhibit B, p. 7, l. 10-13 and 16-20; p. 48, l. 19-25; *also see* Deposition of Chris Martin attached hereto as Exhibit C, p. 5, l. 22-25; p. 6, l. 1-6.

9.      Prime's Fleet Managers oversee Prime's non-trainee drivers, and the Fleet Managers report to an Operations Manager, as does Mosley. Exhibit B, p. 6, l. 16-18; p. 7, l. 10-13 and 21-25; p. 8, l. 1.

10.     The Operations Managers and the Fleet Managers make employment decisions related to drivers. Exhibit C, p. 33, l. 3-6.

11.     Chris Martin ("Martin"), the current Driver Development Manager, is in charge of Prime's second training phase (TNT training) and the TNT trainees; TNT trainees have obtained their Commercial Driver's License (CDL) and are trained over-the-road by a trainer. Exhibit B, p. 8, l. 22-25; p. 9, l. 1 and 5-7 and 15-18; and Exhibit C, p. 4, l. 25; p. 5, l. 1; p. 7, l. 2-5.

12.     The Driver Development Manager and the Operations Managers are peers and report to the Director of Operations. Exhibit B, p. 49, l. 18-22; and Exhibit C, p. 5, l. 16-24.

13.     Martin eventually replaced Steve Tassin ("Tassin") as Driver Development Manager, but prior to that, Martin and Tassin worked together, and shared duties, beginning at some

point in 2021 through the date of Tassin's retirement in late 2022. Exhibit C, p. 8, l. 8-11; p. 25, l. 3-9; *also see* Deposition of Steve Tassin attached as Exhibit D, p. 6, l. 5-7 and l. 25; p. 7, l. 1-2; p. 8, l. 17-25; p. 9, l. 1-6; p. 18, l. 16-19.

14.     The Driver Development Manager is responsible for hiring trainers, called TNT trainers, who train TNT trainees, and is also the manager for the TNT trainers and trainees. Exhibit C, p. 12, l. 16-19; and Depo. Ex. 24, Prime-000001.

15.     While Operations Managers and the Driver Development Manager are responsible for making employment decisions related to drivers, and trainers and trainees, respectively, including discipline and termination decisions, they do receive input when doing so from human resources and Mosley as the Female Driver Liaison. Exhibit B, p. 14, l. 8-25; p. 15, l. 1-8.

16.     TNT trainers are required to take additional anti-sexual harassment training as part of their "TNT/CDL Instruction" through a computer module, and as part of that training, each TNT trainer has to sign Prime's anti-sexual harassment policy again. Exhibit B, p. 29, l. 25; p. 30, l. 1-9.

17.     TNT trainers also receive training through a class taught by Mosley titled "Sexual Harassment/Harassing Work Environment/Discrimination Class Overview," wherein the TNT trainers are told they are the acting manager in the truck and instructed as to proper and prohibited behaviors in that role in relation to potential sexual harassment and discrimination claims that may be made against a trainer. Exhibit B, p. 28, l. 12-25; p. 29, l. 1-24; Depo. Ex. 3.

18.     Although TNT trainers are told that they are the acting manager during Mosley's TNT training, they are also told that they cannot make decisions as to trainees, that they must inform their fleet manager of problems, and that they cannot remove a trainee from training as that decision can only be made by in-house management. Depo. Ex. 3, Prime-001127 to Prime-001128.

19.     On March 30, 2022, Benitez began her second phase of training, TNT training, with trainer Oswald Thompson ("Thompson"). Exhibit A, p. 40, l. 10-12 and 17-21; and Exhibit B, p. 10, l. 15-21; p. 11, l. 9-16.

20.     Thompson received anti-sexual harassment training during his orientation on August 23, 2021, and again as a trainer as part of the TNT program on September 28, 2021, and on both dates, he signed Prime's anti-sexual harassment policy; Thompson would not have been allowed to certify as a TNT trainer without completing that additional training. Exhibit B, p. 30, l. 10-14; p. 33, l. 1-11; *also see* Thompson's training acknowledgements attached as Exhibit E.

21.     Prime's IT added an additional line for TNT trainer anti-sexual harassment training to its driver system "after" Thompson received that training, and this is why his original driver master file does not reflect that training. Exhibit B, p. 39, l. 12-25; p. 40, l. 1-4; *also see* Exhibit E.

### Benitez's Allegations Against Thompson

22.     Benitez claims that on her first TNT training day, March 30, 2022, Thompson was "flirtatious" and on the second day, March 31, he made comments such as, "You want to sleep with your clothes off," that she "could have sex with him," that if she "got cold" she "could get in bed with him," and that he had a "girl…on his truck that liked to sleep nude;" Benitez told Thompson that was not what she was looking for. Exhibit A, p. 44, l. 6-20; p. 45, l. 6-25; p. 48, l. 8-13.

23.     Benitez called her son on March 31, 2022 and told him, without Thompson hearing the call, how her training was going and that she felt Thompson was going to teach her a lot, and she shared some of Thompson's comments, to which her son responded those were "the worst pickup lines…and kind of joked about it." Exhibit A, p. 46, l. 15-21; p. 47, 3-19.

24.     Benitez also spoke with another female trainee about Thompson's comments and stated, "[W]e basically said the same thing, like maybe he was just flirting, just give it a couple of

days, and just see how things go. 'Maybe he was just trying to flirt with you.'" Exhibit A, p. 48, l. 22-25; p. 49, l. 1-7.

25.     Benitez claims Thompson asked to have sex with her three or four times, asked her to take a shower with him several times, and claims that Thompson would not keep his hands to himself and that he hit ("popped") her on the "butt" and told her she had a "bad attitude" and needed a "spanking." Exhibit A, p. 66, l. 23-25; p. 67, l. 1-4; p. 75, l. 6-13; p. 114, l. 4-8; p. 120, l. 5-10.

26.     Benitez claims Thompson popped her on the butt three times, but admits he never spanked her, or grabbed her butt, or her breasts, or her other body parts, with the exception of her arm. Exhibit A, p. 75, l. 15-18; p. 76, l. 13-20; *also see* paragraph 29, *infra*.

27.     Benitez claims that Thompson rubbed her leg from the passenger seat while she was driving, two or three times, and that Thompson put his pelvis on her when she was getting gas, but he only did that "once" because she "pushed him back." Exhibit A, p. 50, l. 24-25; p. 51, l. 1-2; p. 52, l. 5-16.

28.     After Benitez pushed Thompson "back" she claims he asked if she was going to report him and she told him no, if he stopped, and kept his hands to himself, to which she claims Thompson replied, " 'Oh, I understand. You're just a good-looking woman. You got a nice butt,' this and that. 'You got nice boobs' and stuff like that. 'And I'm really attracted to you. I know I'm an older guy. I'm' well, this and that." Exhibit A, p. 52, l. 15-16; p. 53, l. 4-19.

29.     Benitez claims when questioning whether she would report him, Thompson started crying and grabbed her arm telling Benitez not to do so, but Benitez admits that Thompson was never physically violent with her or trying to hurt her. Exhibit A, p. 76, l. 18-25; p. 77, l. 1-4; p. 127, l. 15-19; p. 128, l. 7-9.

30.     Benitez also admits that Thompson never showed her explicit or inappropriate images and he never exposed himself to her. Exhibit A, p. 156, l. 6-8 and 18-19.

5

31.    Benitez admits she did not "immediately report" Thompson's behavior and "tried to talk to him to give him the benefit of the doubt." Exhibit A, p. 39, l. 1-2 and 6-12.

32.    Benitez had an iPhone, iPad, and cell phone and internet access during her time with Thompson. Exhibit A, p. 33, l. 7-14; p. 39, l. 19-25; p. 40, l. 1-2; p. 65, l. 16-21; p. 69, l. 11-18.

33.    Benitez had time to jog while training with Thompson, and take walks while Thompson was doing things such as going to the casinos. Exhibit A, p. 120, l. 20; p. 123, l. 19-21.

### Benitez's Anonymous Reports Regarding Thompson

34.    On April 2, 2022, Benitez first reached out to Prime regarding Thompson's behavior and she did so by emailing Mosley, anonymously, without identifying herself, or Thompson, or the truck she was on. Exhibit A, p. 40, l. 1-9; p. 48, l. 14-20; p. 50, l. 9-10; Exhibit B, p. 53, l. 11-17.

35.    Benitez reached out to Mosley via email because Mosley was the person that Benitez felt comfortable speaking with about the situation. Exhibit A, p. 38, l. 16-21.

36.    When emailing Mosley on April 2, at 7:47 pm, Benitez used an email that she had not provided to Prime, her daughter's email address, lola.bb@aol.com, and in that email, Benitez claimed she had been "sexual[ly] harassed" by her trainer but provided Mosley with no information from which Mosley could identify Benitez or the trainer. Exhibit A, p. 54, l. 21-25; p. 55, 1-24; Depo. Ex. 5, Prime-001137.

37.    Mosley attempted to determine who the trainee was by contacting Prime's IT and security and conducting a system search, by having a paid social media search conducted, and by putting other members of the training team on notice, including Tassin and Martin, but Mosley's attempts at determining Benitez's identity were unsuccessful. *See* Mosley emails attached hereto as Exhibit F, Prime-001131 to Prime-001133.

38.    Benitez knew she did not provide Mosley with identifying information in her initial email, and Benitez did not expect Mosley to do anything in response to it. Exhibit A, p. 56, l. 6-14.

39.     At 8:00 pm on April 2, Mosley responded via email and told Benitez the information was confidential, and that her trainer would not be made aware of her report, and Mosley asked Benitez to identify herself, and provide her truck number, location, and fleet manager; Mosley also provided her cell phone number to Benitez. Exhibit A, p. 56, l. 15-21; Depo. Ex. 5, Prime-001136.

40.     Receiving no response from Benitez, Mosley emailed Benitez again on April 3, 2022, at 11:39 am, asking Benitez to respond. Exhibit A, p. 57, l. 7-14; Depo. Ex. 5, Prime-001136.

41.     Benitez anonymously responded to Mosley on April 3, 2022, at 4:20 pm, and stated, "I spoke to my trainer. He promised it would not happen again. So moving forward I will keep you posted." Exhibit A, p. 57, l. 15-18; Depo. Ex. 5, Prime-001136.

42.     According to Benitez, she believed Thompson would stop the behavior because Benitez told Thompson she was not attracted to him, although he was attracted to her, and "he understood" where Benitez was coming from. Exhibit A, p. 57, l. 19-25; p. 58, l. 1-5; p. 61, 9-22.

43.     Mosley emailed Benitez on April 3, 2022, at 4:19 pm, MDT, stating:

These allegations are…not allegations of a situation that we would allow a trainee to remain in. That is against Prime Policy…I am going to have to insist on your name so I can get you into a proper training environment and investigate…This is to protect yourself, Prime, and future females…All reports are confidential…we do not share information with future trainers. You are removed from the truck in a safe manner and in a manner you are comfortable with. Prime does not tolerate retaliation…I hope you understand there is a bigger picture here…and I am here to protect you, Prime, and all future trainees…I have logged on to immediately assist and will await at work for your reply.

Exhibit A, p. 62, l. 16-21; and Depo. Ex. 5, Prime-001135.

44.     Benitez anonymously responded to Mosley on April 5, 2022, at 7:41 pm, stating:

I can not jeopardize my safety anymore until I am safely off the truck in my state. Insisting I reveal who I am confirms exactly what this guy is telling me regarding fleet managers protecting him…my word against his. And I need proof of his behavior because he has done this before. He has a gun on his truck never seen it but he has stated it. As soon as I am home I will get a lawyer to call you I am not trusting anybody in this company…

Exhibit A, p. 62, l. 22-25; p. 63, l. 1-3; and Depo. Ex. 5, Prime-001135.

7

45.     According to Benitez, and her comment about needing "proof," her intention was to audio record Thompson. Exhibit A, p. 68, l. 5-7.

46.     Mosley responded to Benitez on April 5, 2022, at 6:55 pm, MDT, stating:

I assure you this is not how we operate. You have complete control of how you are removed in a safe location. We can even call the police to assist you. I am not a fleet manager. My sole job is to protect your safety. I can get you a rental car home…I can have the truck secretly routed to Springfield or to your home state faster…I hope you give me the opportunity to help you…

Exhibit A, p. 73, l. 5-12; and Depo. Ex. 5, Prime-001134.

47.     Benitez indicated that she purposely emailed Mosley anonymously, knowing that Mosley could not remove Benitez from the truck if Mosley did not know Benitez's identity; Benitez did not expect Mosley to do anything. Exhibit A, p. 71, l. 20-25; p. 72, l. 1-7.

48.     On the evening of April 10, 2022, while at a truck stop, Benitez made an audio recording of Thompson, using her iPad, and she "addressed" with him her issues with his alleged behavior. Exhibit A, p. 100, l. 11-13; p. 101, l. 4-14; p. 103, l. 25; p. 104, l. 1-4; p. 106, l. 1-4; p. 111, l. 12-17; *also see* paragraph 79, *infra*.

49.     Benitez had previously tried to record Thompson using her cell phone, but those recordings were muffled, and her son told her how to record Thompson with an iPad using its voice memo. Exhibit A, p. 68, l. 5-13; p. 69, l. 11-18.

50.     Per Benitez, Thompson seemed "nervous" during the discussion she recorded, but he was not "agitated" and "when he was talking, he was calm," and afterwards, Benitez believed that he wanted to provide Benitez with better training. Exhibit A, p. 106, l. 13-22; p. 109, l. 15-19.

**Prime's Response Once Benitez Identified Herself**

51.     On April 11, 2022, at 10:05 am, Benitez responded to the email that Mosley had sent Benitez on April 5, 2022, at 6:55 pm, MDT. Exhibit A, p. 79, l. 21-25; Depo. Ex. 5, Prime-001134.

52.     When Benitez emailed Mosley on April 11, Benitez and Thompson were parked at a truck stop in Utah, and Benitez's email stated, "Please tell me the plan to get me off this truck…I really fear for my safety after confronting him. I have a recording of him…I need to get it to you." Exhibit A, p. 83, l. 2-13; p. 97, l. 11-17; p. 124, l. 14-18; Depo. Ex. 5, Prime-001134.

53.     Mosley responded via email at 10:46 am on April 11 and reminded Benitez that she still did not know Benitez's identity. Exhibit A, p. 84, l. 21-23; Depo. Ex. 5, Prime-001134.

54.     Mosley then emailed Benitez at 11:03 am, stating, "If you don't want to tell me who you are so that I can assist, I recommend making up a family emergency and getting off the truck asap at a hotel…We can then assist you with a rental or something…Call 911 if any issues. This is my best advice without knowing who you are." Exhibit A, Depo. Ex. 5, Prime-001134.

55.     Benitez emailed Mosley at 11:20 am on April 11 informing Mosley that Benitez was calling Mosley. Exhibit A, p. 84, l. 24-25; p. 85, l. 1-4; Depo. Ex. 7, Prime-001120.

56.     Benitez admits she did not identify herself to Mosley until that April 11, 2022 phone call. Exhibit A, p. 101, l. 1-3; p. 104, l. 18-21; and Exhibit B, p. 53, l. 18-21.

57.     The cell phone connection between Benitez and Mosley was poor, and at 11:24 am, Mosley emailed Benitez asking for the truck number, and emailed at 11:31 am asking Benitez to text the truck number, or leave it on Mosley's voicemail, as Mosley could not hear the truck number due to Benitez "cutting out." Exhibit A, p. 86, l. 20-25; p. 87, 1-13; Depo. Ex. 7, Prime-001120.

58.     That morning, April 11, Benitez eventually left a message on Mosley's voicemail with the truck number, and Benitez also spoke with one of her prior in-house trainers, Amanda Williams ("Williams"), relaying the truck number. Exhibit A, p. 88, l. 9-21; p. 89, l. 17-23.

59.     Benitez was able to make the calls to Mosley and Williams because Thompson was "back and forth out of the truck" while they were parked at the truck stop. Exhibit A, p. 98, l. 3-14.

60.	Williams spoke with a safety coordinator who provided Benitez's name and location at 11:20 am, via email, to Prime's Director of Security, Bill Boehning. *See* Exhibit G attached, Prime-001153.

61.	At 11:29 am, the Salt Lake City Operations Manager indicated that security would pick Benitez up and security responded at 11:32 am asking for Benitez's driver code, picture, and location. Exhibit G, Prime-001150 and Prime-001151.

62.	Mosley emailed Benitez at 11:37 am on April 11 stating that if Benitez was on truck number 690706, Prime security and management were working to get Benitez off the truck under a family emergency excuse, and at 11:37 am, Benitez replied to Mosley telling Mosley that that was the correct truck number. Exhibit A, p. 88, l. 11-14; p. 91, l. 7-12; Depo. Ex. 7, Prime-001120.

63.	While parked at the truck stop, and after Benitez had reached out to Mosley, Thompson was training Benitez about things on the outside of the truck, such as tandems, and he asked Benitez if she had a family emergency. Exhibit A, p. 96, l. 5-15; p. 97, l. 7-25; p. 98, l. 1-2.

64.	Benitez went into the truck stop's Wendy's and called the police, and at 11:51 am on April 11, she texted Mosley and stated she was in Wendy's and that she, Benitez, was waiting for the police. Exhibit A, p. 98, l. 15-18; p. 99, 7-18; p. 124, l. 19-21; Depo. Ex. 6, Prime-000963.

65.	Benitez did not feel unsafe while in Wendy's and the police arrived at some point prior to 12:36 pm on April 11, around the same time Benitez was emailing and calling Mosley and Williams. Exhibit A, p. 87, l. 17-22; p. 92, l. 2-15; p. 129, l. 13-17; Depo. Ex. 6, Prime-000963.

66.	Benitez understood that Prime was sending security from its Salt Lake City terminal to pick her up from the Utah truck stop. Exhibit A, p. 130, l. 15-21; and Exhibit B, p. 48, l. 19-25.

67.	At 12:12 pm on April 11, Mosley texted Benitez that Prime security was on its way; Mosley also told Benitez to stay in Wendy's and that security would put Benitez in a bunk room in

Prime's terminal so she would have security with her. Exhibit A, Depo. Ex. 6, Prime-000963; *also see* Exhibit G, Prime-001149.

68.　　Prime security arrived at Wendy's around 12:49 pm, and security placed Benitez in their locked truck away from Thompson's truck (leaving her the keys to drive off if necessary) while they searched Thompson's truck—Thompson stood outside of his truck. Exhibit A, p. 27, l. 3-16; p. 28, l. 1-3; Depo. Ex. 6, Prime-000964; *also see* Exhibit H attached, Prime-001163.

69.　　Prime security searched Thompson's truck because Benitez claimed Thompson had a gun, although Benitez admits she never saw a gun and further admits Thompson never threatened her with a gun. Exhibit A, p. 28, l. 1-18; p. 29, l. 8-13.

70.　　Although the police declined to search Thompson's truck, Prime security searched the truck and found no evidence of a gun or other restricted items. Exhibit G, Prime-001149; and Exhibit H, Prime-001163.

71.　　Security returned Benitez to the Salt Lake City terminal on April 11, 2022, and placed her in a bunkroom. Exhibit G, Prime-001145.

72.　　Benitez admits that as soon as Prime knew her identity, Prime took action to remove Benitez from Thompson's truck. Exhibit A, p. 157, l. 3-5.

**Mosley's Investigation of Benitez's Allegations Against Thompson**

73.　　Mosley, as Female Driver Liaison, is responsible for investigating sexual harassment complaints involving drivers, and she also assisted in getting Benitez removed from Thompson's truck and to a safe place, and she participated in obtaining statements and completing the investigation regarding Benitez's complaints against Thompson. Exhibit B, p. 11, l. 20-25; p. 12, l. 1-12; p. 13, l. 24-25; p. 14, l. 1-2; p. 53, l. 22-25; and Exhibit D, p. 13, l. 8-17.

74.　　Benitez claims to have made a handwritten statement of the events involving Thompson and claims to have taken a picture of that statement, storing it on her phone; Benitez

first produced that statement to Prime during her deposition. Exhibit A, p. 132, l. 4-5 and 21-25; p. 133, l. 1 and l. 6-12; p. 134, l. 9-16; p. 136, l. 10-15; Exhibit B, p. 55, l. 21-25; p. 56, l. 1-7.

75.     On April 12, 2022, at 9:07 am, Mosley texted Benitez and asked for a "detailed statement" in order for Mosley to investigate Benitez's allegations against Thompson, and Benitez admits that as of April 12, she had not provided a written statement to Mosley. Exhibit A, p. 146, l. 21-25; p. 147, l. 1-6; Depo. Ex. 6, Prime-000964.

76.     At 9:12 am on April 12, Benitez responded that she would send her audio recording of Thompson to Mosley's email, but stated, "I don't want to make a statement until I obtain a lawyer." Exhibit A, p. 147, l. 7-18; Depo. Ex. 6, Prime-000964 and Prime-000965.

77.     At 9:09 am on April 12, Mosley texted Benitez that she had placed Benitez on guaranteed pay and Mosley asked Benitez if she would like "home time" or to be immediately assigned to another trainer; Benitez responded that she would like to go home. Exhibit A, Depo. Ex. 6, Prime-000964.

78.     At 9:15 am on April 12, Benitez texted Mosley that she was emailing the audio recording that she had made of Thompson to Mosley. Exhibit A, Depo. Ex. 6, Prime-000965.

79.     At 9:16 am on April 12, Benitez sent Mosley an email with only the recording attached (no statement was attached) and that recording was titled "Stagecoach Blvd 2," which was recorded (created) by Benitez shortly after 7 pm on April 10, 2022. Exhibit A, p. 102, p. 22-25; p. 103, l. 1-5; p. 223, l. 5-17; p. 224, l. 13-18; Depo. Ex. 13; *also see* media properties for Stagecoach Blvd 2 attached as Exhibit I.

80.     At 9:15 am on April 12, Mosley texted Benitez stating that if Benitez did not want to submit a statement, that Prime could interview Benitez to obtain the details, to which Benitez responded, "Please use my emails to address the situation and you have the recording." Exhibit A, p. 147, l. 19-25; p. 148, l. 1-6; Depo. Ex. 6, Prime-000965.

81.     At 9:29 am on April 12, Brooke texted Benitez telling her that the audio recording was very helpful. Exhibit A, p. 148, l. 7-19; Depo. Ex. 6, Prime-000965.

82.     Benitez was not disciplined for refusing to provide a statement regarding her allegations against Thompson. Exhibit B, p. 56, l. 8-14; p. 58, l. 4-7.

83.     At 9:32 am on April 12, Mosley texted Benitez to plan for Benitez's travel home and Prime reimbursed Benitez for her expenses, including an initial bus ticket and Uber, as well as a plane ticket necessitated due to poor roads. Exhibit A, p. 149, l. 19-25; p. 150, l. 1; Depo. Ex. 6; Prime-0000965 to Prime-000967; Prime-000117 to Prime-000119.

**Thompson's Termination and Benitez's Additional Allegations Against Thompson**

84.     Following Mosley's investigation, which included Mosley's and Tassin's review of the April 10, 2022 audio recording provided by Benitez, Thompson was terminated, and his termination was entered into Prime's driver system on April 18, 2022, by Tassin, as a policy violation. Exhibit B, p. 34, l. 4-25; p. 55, l. 12-20; Depo. Ex. 26, Prime-000988; and Exhibit D, p. 15, l. 15-22; p. 16, l. 7-13.

85.     Benitez claims Thompson previously had sexual relations with other trainers [sic] but admits she only allegedly heard that from Thompson. Exhibit A, p. 7, l. 8-20.

86.     Benitez claims that Prime had knowledge of Thompson's behaviors before putting Benitez on his truck due to comments that Thompson made but Benitez admits she did not hear that anyone at Prime had such knowledge or that Prime had received any prior complaints against Thompson from any female. Exhibit A, p. 152, l. 19-25; p. 153, l. 15-22; p. 154, l. 4-8.

87.     Prior alleged incidents of sexual harassment are documented in a driver's incident file and Thompson had no such prior incidents in his file.  Exhibit B, p. 64, l. 19-25; p. 65, 1-7.

88.     Mosley is also made aware of any such prior complaints or incidents and Mosley was aware of no prior complaints against Thompson. Exhibit B, p. 64, l. 19-25; p. 65, l. 1-22.

89. Tassin was also not aware of any prior complaints against Thompson. Exhibit D, p. 12, l. 19-23.

## Benitez's Training With Rebecca Aguirre

90. On April 15, 2022, Benitez texted Mosley asking about being assigned to a female trainer, and Mosley responded that she would have Benitez put on the list for available female trainers. Exhibit A, p. 150, l. 24-25; p. 151, l. 1-5; Depo. Ex. 6, Prime-000967.

91. Benitez stayed at her home while waiting to be assigned to a female trainer and Prime paid Benitez during that time. Exhibit A, p. 157, l. 7-10.

92. On May 7, 2022, Benitez started training with Rebecca Aguirre ("Aguirre"), and Aguirre picked Benitez up from Benitez's home. Exhibit A, p. 157, p. 11-18.

93. Per Benitez, she hired legal counsel relating to her claims against Thompson prior to training with Aguirre, and per Aguirre, Benitez told Aguirre that "her attorney didn't want her to sign anything in the way of contracts because she wanted to get [Benitez] an exit package because of her lawsuit having to do with the alleged sexual harassment...and…that [Benitez] should still finish her training so she could continue to get paid until the lawsuit was settled." Exhibit A, p. 165, l. 1-10; and Depo. Ex. 16, Prime-000423.

94. Benitez claims that she had issues with Aguirre's capabilities as a trainer and that she called dispatch regarding that, but she cannot remember the days or with whom she spoke. Exhibit A, p. 158, l. 4-11; p. 162, l. 6-14.

95. Benitez recalls calling dispatch regarding an illegal U-turn that she believed Aguirre wanted Benitez to make, but she does not recall with whom she spoke. Exhibit A, p. 158, l. 4-11; p. 168, l. 6-11.

96. On May 22, 2022, Benitez and Aguirre were at a customer's location, mid-evening, dropping off or picking up a product. Exhibit A, p. 172, l. 4-11.

97. That evening, Benitez claims she pulled the truck in the wrong way and when she asked Aguirre for help, Aguirre replied, "Well, what are you going to do when you're by yourself?" and Benitez stated, "You're going to be the last person. I ain't going to call you b-i-t-c-h," and per Benitez, "it just escalated from there." Exhibit A, p. 172 l. 20-25; p. 173, l. 1-9.

98. Benitez claims that Aguirre then proceeded to drop the trailer and returned to Benitez's location, and when Benitez told Aguirre that she had called dispatch, Aguirre told Benitez she wanted Benitez off her truck and began throwing Benitez's things off the truck. Exhibit A, p. 175, l. 4-15.

99. Benitez claims she and Aguirre were "screaming back and forth," and Benitez admits she called Aguirre "Bitch," that she told Aguirre that she was "going to whoop [Aguirre's] butt" in response to Aguirre allegedly saying the same, that she threatened to "kick [Aguirre] in the chest," and "threaten[ed] to kick [Aguirre's] ass." Exhibit A, p. 176, l. 1-13; p. 178, l. 20-22; p. 179, p. 1-3; Exhibit A, p. 218, l. 16-19.

100. When admitting "I threatened to kick [Aguirre] in her chest," Benitez also admitted that any kind of physical threat is against Prime's policies and that a "physical threat could warrant termination." Exhibit A, p. 218, l. 16-22; p. 221, l. 13-15.

101. Benitez knew that Sean Hilton ("Hilton") from dispatch was on the phone with either her or Aguirre during the incident because Hilton kept calling both Benitez's and Aguirre's phones. Exhibit A, p. 178, l. 14-19; p. 179, l. 11-16; p. 189, l. 17-25; p. 190, l. 1-15.

102. On May 22, 2022, Hilton was working as a night dispatcher, and his supervisor was Justin Walker ("Walker"), Fleet Manager; Hilton recalled speaking with Benitez and Aguirre on a prior occasion a few days earlier. *See* Deposition of Sean Hilton attached as Exhibit J, p. 5, l. 4-8; p. 6, l. 1-7; p. 9, l. 8-20; p. 11, l. 18-25; p. 12, l. 1-13; Depo. Ex. 18, Prime-000432.

103.    Hilton called Walker on May 22, 2022 for assistance because he "felt things would escalate to physical violence" and he believed it was necessary to get the fleet manager involved. Exhibit J, p. 15, l. 9-18.

104.    Per Walker, it was appropriate for Hilton to call Walker for assistance in light of the circumstances. *See* Deposition of Justin Walker attached as Exhibit K, p. 11, l. 6-14.

105.    Benitez also spoke with Walker and admitted she "got mad" at Walker and admitted she "started screaming like 'This is you guys' fault. She just threw me out of the truck," and I hung up in his face." Exhibit A, p. 181, l. 22-25; p. 182, l. 1-5; p. 190, l. 16-18.

106.    Benitez claims it was okay for her to "hang up" on Walker because she "didn't want to talk and he kept calling [her] phone back." Exhibit A, p. 183, l. 7-11.

107.    Per Walker, he called Benitez and Aguirre, and he was able to speak with Aguirre and Aguirre indicated that Benitez threatened to physically harm her, Aguirre. Exhibit K, p. 16, l. 6-14; Depo. Ex. 15, Prime-000430.

108.    At 6:32 pm on May 22, 2022, Walker emailed Martin stating:

Received a call from [Hilton]…about these two being in a screaming match…and almost at a fist fight with each other…I attempted to call them. I finally was able to get a call back from lead seat [Aguirre] and they were still in a screaming match with each other and calling each other vulgar names…I asked them to separate and then call me back. I got a call back from [Aguirre] and while she was out of the truck [Benitez] screams at the top of her lungs out the truck at her and they continued to argue. At which time the deputy…shows up and I asked her to talk with him and call me back…[Aguirre] stated that [Benitez] had threatened her to physically harm her…

Exhibit B, p . 71, l. 6-18; Depo. Ex. 15, Prime-000430.

109.    At 6:43 am on May 23, 2022, Walker forwarded his email, wherein Aguirre stated that Benitez had threatened to physically harm Aguirre, to Mosley. Depo. Ex. 15, Prime-000430.

110.    Benitez had also previously texted with Mosley on May 22, 2022, and later spoke with Mosley that evening, and Benitez admits that Mosley called Benitez back multiple times. Exhibit A, p. 187, l. 11-21; Depo. Ex. 6, Prime-000969.

16

111.     Per Mosley, Benitez was "screaming and cussing" during the calls and hung up on Mosley, but Mosley continued to call Benitez back. Exhibit B, p. 72, l. 13-25; p. 73, l. 1-6.

112.     Benitez admits that she hung up on Mosley on multiple occasions. Exhibit A, p. 194, l. 1-7 and 19-21.

113.     Benitez also admits that Mosley asked Benitez to "stop screaming and yelling and hanging up on people," and that after that, Benitez "just -- quit answering the phone." Exhibit A, p. 184, l. 5-10.

114.     Benitez admits that Mosley was required to text Benitez at 7:24 pm on May 22, because Mark, dispatch supervisor, was calling Benitez to "help" her, but Benitez kept hanging up. Exhibit A, p. 187, l. 22-25; p. 188, l. 1-9; Depo. Ex. 6, Prime-000969; Exhibit B, p. 73, l. 10-21.

115.     After Mosley texted Benitez at 8:06 pm on May 22, 2022, to tell Benitez that Mark had money for Benitez for an Uber, and food, and a hotel room, Benitez finally answered Mark's call. Exhibit A, p. 185, l. 11-16; p. 188, l. 10-16; Depo. Ex. 6, Prime-000969.

116.     Benitez also audio recorded the events that transpired that evening between she and Aguirre (the "Aguirre-Benitez incident"). Exhibit A, p. 176, l. 17-19.

117.     On May 23, 2022, at 9:25 am, Mosley asked Benitez for a statement regarding the Aguirre-Benitez incident to which Benitez responded at 9:35 am, "You'll have to speak with Jackson Spencer Law." Exhibit A, p. 188, p. 20-25; p. 189, l. 1-6; Depo. Ex. 6, Prime-000970.

118.     According to Benitez, she did not provide a statement to Mosley because her lawyers told her to wait and that they, her counsel, would provide a statement when they provided the audio recording Benitez had made on May 22, 2022. Exhibit A, p. 180, l. 7-24.

119.     At 9:36 am on May 23, Mosley texted Benitez that she herself could not speak with Benitez's legal counsel but that she would provide that information to Prime's legal counsel, and

at 9:53 am, Mosley provided Benitez with the contact information for Prime's General Counsel. Exhibit A, p. 189, l. 7-9; Depo. Ex. 6, Prime-000970.

120.    Tassin also attempted to contact Benitez on May 23, 2022, in order to get Benitez to a better location but Benitez initially refused to speak to him. Exhibit A, Depo. Ex. 6, Prime-000969.

121.    On May 24, 2022, Mosley texted Benitez and again requested information from Benitez in order to investigate the Aguirre-Benitez incident and Benitez responded, "My lawyer has my statement and the voice recording…and Sean [Hilton] was on the phone when everything transpired." Exhibit A, p. 189, l. 10-25; Depo. Ex. 6, Prime-000971.

122.    In response, Mosley texted Benitez and indicated she would get a statement from Hilton. Exhibit A, Depo. Ex. 6, Prime-000971.

123.    Mosley emailed Walker and Martin requesting a statement from Hilton and stated, "[Benitez] claims [Hilton] was on the phone and a witness to what took place during this incident. I will need a statement on exactly what took place in that phone call and what he heard." Exhibit B, Depo. Ex. 19, Prime-000356.

124.    Mosley also spoke with Aguirre and requested a statement, and at 2:26 pm on May 24, 2022, Mosley received a statement from Aguirre, a portion of it states:

…I told [Benitez] that she was using the same…excuse she used for anything she didn't want to do instead of asking for…help. She…got out of the truck and said "You drive the (expletive starting with the letter F) truck then" and slammed the door and started to walk off. I shouted at her to come back to move the truck and she again cursed at me…I backed the truck out…drop[ped] the trailer…got back in my truck and…Benitez was back in the truck. I stated…she and I needed to have a conversation and she…call[ed] me…(Expletive starting with the letter B) and said we didn't have anything to talk about…that she didn't have to listen…and that I was going to take her to the terminal… I stated that if she wasn't going to shut up and listen she could get off of my truck…We got into a shouting match with lots of cursing and name calling on both sides and she threatened to kick me in my face {She was on the top bunk and I was below standing between both seats} she also stated that she would kick my ass if she wasn't scared to go to jail. I advised…she wasn't going to do anything to me except get the (Insert expletive starting with the letter F here) off of my truck. She then used the same threat about kicking me in my face and more name

18

calling…I…took two of her bags and dropped them outside the drivers side door and told her she was next…I called 911…While waiting…I called my dispatcher…Walker……

Exhibit B, p . 74, l. 19-25; p. 75, l. 1-12; Depo. Ex. 16, Prime-000424.

125.    At 4:17 pm on May 24, Benitez texted Mosley and stated her legal counsel had instructed Benitez not to discuss the matter. Exhibit A, p. 191, l. 2-5; Depo. Ex. 6, Prime-000971.

126.    At 7:24 pm, Mosley received Hilton's statement, a portion of which states:

…On 5/22, at approximately 1800CST, I received a call from [Benitez]. Before I could barely greet her, she was yelling and screaming at me about [Aguirre] disrespecting her and treating her badly. She said she wanted off the truck ASAP, that she felt Prime was not training her properly, and that she wasn't going to drive with [Aguirre] anymore. At one point, [Benitez] said something along the lines of "I'm going to kick her in her f***ing face, is what I'm gonna do." Every time I tried to speak, [Benitez] would interrupt and begin yelling at me, yelling at [Aguirre]. With barely any warning, she hung up the phone…

Exhibit B, p . 71, l. 6-18; Depo. Ex. 18, Prime-000433.

127.    Per Hilton, he provided a statement in order to give Mosley and Martin "information on the events that happened" between Benitez and Aguirre and prior to doing so, he only spoke to Walker about the matter on the night in question. Exhibit J, p. 19, l. 15-25; p. 20, l. 1-6.

128.    When writing his statement, Hilton used the phrase "I'm going to kick her in her f**ing face," because he "specifically remember[ed] that because it was a specific way to phrase something, not just a…general…I just want to hit her. It was a very specific way [Benitez] was going to do something, so [he] remembered that." Exhibit J, p. 22, l. 22-25; p. 23, l. 1-6.

129.    Hilton did not hear Aguirre make any threats to Benitez. Exhibit J, p. 24, l. 10-12.

130.    Neither Hilton nor Walker had ever heard of Thompson; the only experience each had with Benitez was when she was training with Aguirre on Walker's fleet. Exhibit J, p. 24, l. 13-20; and Exhibit K, p. 7, l. 3-8.

### Prime's Termination of Benitez's Training

131.    Following her investigation, Mosley was involved in the decision to terminate Benitez's training in that she communicated and consulted with Tassin, who made the termination

decision based on correspondence from and communication with Mosley. Exhibit B, p. 14, l. 23-25; p. 15, l. 1-8; p. 49, l. 2-5; and Exhibit D, p. 7, l. 23-25; p. 8, l. 1-25; p. 9, l. 1-6; p. 13, l. 18-25; p. 14, l. 1-8.

132.    At the time of Benitez's termination, Tassin was still serving in his primary role of training manager and Martin was primarily pairing trainers and trainees. Exhibit C, p. 50, l. 8-19.

133.    According to Tassin, Benitez's behavior violated Prime's policy expectations for its students and drivers in that it was very extreme and dangerous behavior, and threatening to another driver, and further, the manner in which Benitez dealt with night dispatch was very unacceptable. Exhibit D, p. 19, l. 22-25; p. 20, l. 1-23.

134.    On May 25, 2022, Benitez's training was terminated "[b]ased on [Hilton's] statement of witnessing [Benitez] make physical threats to [Aguirre], the statement from the trainer [Aguirre] alleging physical threats, and [Benitez's] refusal to respond or provide information on what occurred during th[e] incident;" Prime made the decision that it could not "place Benitez in another trainers truck when there is potential for physical violence." Exhibit B, p. 42, l. 2-15; p. 51, l. 10-24; p. 57, l. 2-13; Depo. Ex. 25, Prime-000052; and Depo. Ex. 19, Prime-000354.

135.    On May 25, 2022, Mosley sent an email to Benitez informing her that Prime would not be continuing her training, marking that as a "voluntary resignation," and also paying Benitez her guarantee through May 27, paying for her travel home, and cancelling her training contract in order for Benitez to not owe any money to Prime. Exhibit B, p. 16, l. 14-21; Depo. Ex. 14.

136.    The Department of Transportation requires Prime to submit a report when a driver is terminated (a "DAC report") and Mosley marked Benitez's termination as "voluntary" wherein the DAC report would not keep Benitez from gaining employment at another trucking company. Exhibit B, p. 16, l. 22-25; p. 17, l. 1-25.

137.    Prime also disciplined Aguirre for her conduct; Aguirre was not allowed to train trainees after the incident for a significant period of time meaning that Prime would no longer put another person on her truck (and Aguirre would no longer benefit monetarily from having a trainee in her truck). Exhibit B, p. 37, l. 4-12; p. 38, l. 9-17; and Exhibit K, p. 8, l. 25; p. 9, l. 1-4.

## Communications Between Legal Counsel

138.    Benitez's legal counsel sent an email to Mosley on May 23, 2022, at 2:50 pm, stating, "Please see the attached letter regarding the claims of our client, Samynthia Benitez. Thank you," which contained an attachment. *See* Exhibit L attached, Prime-001157.

139.    Mosley forwarded Benitez's counsel's letter to Prime's General Counsel, Steve Crawford ("Crawford"), that same day, or on May 23, 2022, at 2:50 pm, without opening the attachment. Exhibit L, Defendant's Answer to Plaintiff's Interrogatory No. 24.

140.    Crawford did not notify or tell Mosley prior to the date that Benitez was terminated that Benitez had filed a charge of discrimination. Exhibit B, p. 85, l. 4-13.

141.    Hilton and Walker were also unaware that Benitez filed a charge of discrimination. Exhibit J, p. 20, l. 7-17; and Exhibit K, p. 13, l. 24-25; p. 14, l. 1-6.

142.    Because Benitez had retained legal counsel and because her legal counsel had officially put Mosley on notice of that via her counsel's email, it was necessary for the driver development and training team to consult with Crawford prior to Benitez's termination. Exhibit B, p. 49, l. 9-12; p. 84, l. 20-25; p. 85, l. 1-3.

143.    The driver development and training team relating to Benitez's termination consisted of Tassin and Mosley. Exhibit B, p. 49, l. 2-8.

**Benitez's Claims**

144.     Benitez claims that Thompson subjected her to sexual harassment and that after she complained about the sexual harassment, she was removed from Thompson's truck, and placed on leave. *See* Complaint, Doc. 1, ¶¶ 11-20.

145.     Benitez also claims her training was terminated because she reported the conduct of Thompson and Aguirre. Exhibit A, p. 8, l. 18-20.

146.     Per her Complaint, Benitez claims that her counsel's email of May 23, 2022, put Prime on notice that she had filed a charge of discrimination. *See* Complaint, Doc. 1, ¶ 22.

147.     Per her Complaint, Benitez claims her training was terminated due to the filing of the charge of discrimination. *See* Complaint, Doc. 1, ¶ 23.

## II.     STANDARD OF REVIEW

Summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file…show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Long v. Aramark Uniform & Career Apparel,* 2005 WL 1006406 at *6 (W.D. Mo. 2005) (*citing* FED.R.CIV.P. Rule 56(c)). The facts are viewed in the light most favorable to the adverse party and that party is allowed the benefit of all reasonable inferences. *Id*. Rule 56(c) mandates entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case on which it bears the burden of proof. *McMiller v. Metro*, 2010 WL 2696706 at *2 (E.D. Mo. 2010). "[S]ummary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets." *City of Mt. Pleasant v. Assoc. Elec. Coop*., 838 F.2d 268 (8th Cir. 1988)). And "[w]hile employment discrimination cases are often fact intensive and dependent on nuance in the workplace, they are not immune from summary

judgment…[and]…remain[] a useful pretrial tool to determine whether or not a[] case…merits a trial." *Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010) (citations omitted).

## III.    ARGUMENT

### A.    BENITEZ CANNOT SHOW THAT SHE WAS SUBJECTED TO A SEXUALLY HOSTILE WORK ENVIRONMENT

Title VII prohibits an employer from discriminating against an individual with respect to their compensation, terms, conditions, or privileges of employment because of their sex. 42 U.S.C. § 2000e-2(a)(1). Benitez claims she was harassed by her trainer, Thompson, acting in a supervisory role. Regardless of whether Thompson was Benitez's supervisor,[2] "[h]ostile work environments created by supervisors or coworkers have the following [required] elements in common: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment." *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 683 (8th Cir. 2012) (*quoting Gordon v. Shafer Contr. Co.*, 469 F.3d 1191, 1194 (8th Cir. 2006) (internal citation omitted). "In addition, for claims of harassment by non-supervisory personnel, [the plaintiff] must show that [her] employer knew or should have known of the harassment and failed to take proper action." *Id*. Benitez cannot show elements four and five.

#### 1.    Benitez cannot establish element four, that the alleged harassment affected a term, condition, or privilege of employment.

To prevail, Benitez must clear the high threshold of showing that the "harassment was so severe or pervasive as to alter a term, condition, or privilege of employment." *Rheineck v. Hutchinson Tech.*, 261 F.3d 751, 756 (8th Cir. 2001); *also see Sutherland v. Mo. Dpt. of Corr.*, 580 F.3d 748, 751 (8th Cir. 2009). "Actionable harassment must have been both objectively and subjectively offensive affecting a term of employment." *Nichols v. Tri-National Logistics*, 809 F.3d

---

[2] Thompson was not a supervisor under Eighth Circuit precedent. *See* Section III.A.2, *infra*.

981, 985 (8th Cir. 2016). The totality of the circumstances must be considered. *Harris v. Forklift Sys.*, 510 U.S. 17 (1993). Considerations include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 525 U.S. 775, 787 (1998) (citation omitted). "To clear the high threshold of actionable harm, [Benitez] has to show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult.'" *Duncan v. GMC*, 300 F.3d 928, 934 (8th Cir. 2002)(citations omitted).

When analyzing the required fourth element, in a fairly recent opinion, the Eighth Circuit stated, "Although the Supreme Court's precedent is clear that 'Title VII comes into play before the harassing conduct leads to a nervous breakdown,' <u>our Eighth Circuit precedent sets a high bar</u> for conduct to be sufficiently severe or pervasive in order to trigger a Title VII violation." *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 538 (8th Cir. 2020) (emphasis added).[3] Under that precedent, even "some conduct well beyond the bounds of respectful and appropriate behavior is nonetheless insufficient to violate Title VII." *Id.* (*citing McMiller v. Metro*, 738 F.3d 185, 188 (8th Cir. 2013) (outlining cases illustrating conduct not sufficient to amount to severe or pervasive conduct, including, *Duncan*, *supra*, 300 F.3d at 931 (supervisor sexually propositioning plaintiff, petting her hand, showing pacifier shaped like a penis, and asking her to draw image of a phallic object to show qualifications for position, insufficient), and *LeGrand v. Area Res. for Comm. & Hum. Serv.*, 394 F.3d 1098 (8th Cir. 2005) ("graphic sexual propositions and even incidental unwelcome sexual contact, did not establish severe or pervasive conduct sufficient to be

---

[3] In *Paskert*, the manager bragged about his sexual conquests, attempted to rub plaintiff's shoulders, told her he was going to give her a hug, and told plaintiff "I could have you...You could be mine." The Eighth Circuit found that behavior "reprehensible and improper" and volatile in that the "treatment toward women was demeaning, sexually suggestive and improper," but it held such conduct did not rise to the level of actionable sexual harassment. 950 F.3d at 537-38.

actionable")). Hence, "[t]he standard for demonstrating a hostile work environment…is 'demanding,' and 'does not prohibit all verbal or physical harassment…it is not a general civility code for the American workplace.' " *Liles v. C.S. McCrossan*, 851 F.3d 810, 823 (8th Cir. 2017).

Benitez's allegations do not support a hostile work environment under the high thresholds set by the Supreme Court in *Faragher* and *Harris*, and the Eighth Circuit in *Duncan* (and its recent progeny),[4] and its District Courts.[5] Benitez claims that Thompson propositioned her, but admits he only did that three or four times, and he never showed her explicit or inappropriate images. ¶¶ 25, 30.[6] She also claims that he made suggestive comments such as suggesting that she could sleep with her clothes off, and she could get in bed with him if he got cold, but she described those as flirtatious, as did another trainee she spoke with, and as joked about by her son. ¶¶ 22-24. Benitez also concedes that when she told Thompson she was not interested, he seemed to understand and tended to apologize by telling Benitez she was a good-looking woman and by complimenting her butt and breasts. ¶¶ 28, 42.

Further, while Benitez claims Thompson could not keep his hands to himself, she admits he popped her on the butt only three times, and that he rubbed her leg from the passenger seat only two or three times. ¶¶ 25-26. She further admits he never spanked her, or grabbed her butt, or her breasts, or other body parts, with the exception of her arm, but she did not perceive that as sexual

---

[4] *See Paskert*, *supra*, n. 3; *also see Lopez v. Whirlpool Corp.*, 989 F.3d 656 (8th Cir. 2021)(condemning the following conduct but finding insufficient—touching plaintiff each time he saw her, although she told him to stop, invading her personal space, blowing on her finger while calling her baby, and glaring at her for long periods).

[5] *See*, *e.g.,* *Watson v. Heartland Hlth. Lab*., 2014 WL 1920432 (W.D. Mo. 2014), *aff'd*, 790 F.3d 856 (8th Cir. 2015) (touching inside of plaintiff's thigh and crotch, even after being brushed away, trying to kiss plaintiff, and using offensive comments insufficient); and *Florido v. Heartland Beh. Hlth. Serv.*, 2010 WL 4220498 (W.D. Mo. 2010) (kissing plaintiff on forehead and mouth, touching plaintiff's back, telling plaintiff he loved her, sending plaintiff flowers, insufficient).

[6] Hereinafter, all paragraph references are to Defendant's Statement of Undisputed Material Facts.

or an attempt by Thompson to hurt her. ¶¶ 26. 29. He was also "calm" when she allegedly confronted him. ¶ 50. Plus, Benitez admits that Thompson was never physically violent, and while Benitez does claim that Thompson put his pelvis on her, he only did that once and he never exposed himself to her, nor does she claim to have ever felt his private parts through his clothes. ¶¶ 27, 29.

In sum, Benitez's allegations, even if true, are hardly comparable to the types of conduct required to sustain a sexual harassment claim. *See*, *e.g.*, *Eich v. Bd. of Regents for CMSU*, 350 F.3d 752 (8th Cir. 2003) (repeatedly grazing plaintiff's breasts; frequently touching plaintiff's hair, shoulders, and spine; simulating sex acts near plaintiff; constantly directing sexual innuendos at plaintiff; repeatedly rubbing plaintiff's leg; pressing up against plaintiff when speaking; and pushing groin into plaintiff's shoulder, sufficient); and *Kopp v. Samaritan Health Sys.*, 13 F.3d 264 (8th Cir. 1993) (doctor repeatedly swearing at nurses, calling abusive names, using gender-specific foul language, threatening and physically harming them, sufficient). Benitez's allegations can at most be characterized as "reprehensible and improper" conduct towards her, but that is not enough to cross the high threshold for actionable harassment in this Circuit. *See* footnotes 3-5, *supra*.

Further, Benitez's concessions illustrate that she did not perceive Thompon's conduct as severe or pervasive. In fact, she concedes she did not immediately report his conduct, and she had many opportunities to do so.[7] ¶ 31. Moreover, she purposely waited to report him until the morning "after" she had a recording of his comments, a recording that she admits she tried to obtain earlier.

---

[7] Not only did Benitez have an iPhone, iPad, and internet and cell phone access, she had time to speak with others, and jog and walk, while Thompson was doing things such as going to the casino. ¶¶ 23-24, 32-33, 36. Benitez could have taken action to remove herself, but she chose not to, making this case distinguishable from the circumstances in *Jenkins v. Univ. of Minn.*, 838 F.3d 938, 945 (8th Cir. 2016) wherein the court found an actionable environment due to the fact that the plaintiff and harasser worked alone in an "uninhabited" part of Alaska ("the geographic isolation of the conduct is of paramount importance. Actions that might not rise to the level of severe or pervasive in an office setting take on a different character when the two people involved are stuck together for twenty-four hours a day with no other people—or means of escape—for miles around.").

¶¶ 45, 48, 49, 79. Such illustrates that while his conduct may have been "demeaning, sexually suggestive and improper," it did not permeate her working environment with discriminatory intimidation, ridicule, and insult, nor did it unreasonably interfere with Benitez's ability to do her job.[8] Because Benitez cannot show severe or pervasive harassment, summary judgment is warranted as to her sexual harassment claim.

### 2. Benitez also cannot show element five, that Prime knew or should have known of the alleged harassment and failed to take proper action.

Even if the Court were to find the conduct was sufficiently severe or pervasive, summary judgment is still appropriate because there is no evidence that Prime knew or should have known of the alleged harassment[9] and failed to take prompt, effective remedial action. In this regard, "the employer is liable only if it was negligent in controlling working conditions." *See Lopez*, *supra*, 989 F.3d at 663 (citation omitted).

A negligence standard is applicable because Thompson was not a supervisor. For an employer to be vicariously liable under Title VII for an employee's harassment, the employer must have "empowered that employee to take tangible employment actions…to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"

---

[8] *See*, *e.g.*, *Hairston v. Wormuth*, 6 F.4th 834 (8th Cir. 2021) (stating plaintiff had nice booty, intentionally dropping saltshaker down her shirt, and making "noises" while watching Victoria's Secret fashion show, insufficient); *Cross v. Prairie Meadows*, 615 F.3d 977 (8th Cir. 2010) (pulling plaintiff's hair, brushing back of hand across her breast, responding in physically threatening manner when rebuffed, and spreading rumor she performed oral sex on him, insufficient); and *Nitsche v. CEO of Osage Valley Elec.*, 446 F.3d 841 (8th Cir. 2006) (making myriad of sexual comments to/about plaintiff (including size of his penis), sticking shovel between plaintiff's legs and rubbing him with it, authoring sexually suggestive poem about plaintiff, showing plaintiff a Playboy magazine and pornographic movie, insufficient).

[9] Benitez claims Thompson harassed others, but there is no evidence that Prime had prior knowledge of any alleged complaints. ¶¶ 85-89. Plus, any alleged complaints to coworkers are insufficient to constitute knowledge. *See*, *e.g.*, *Weger v. City of Ladue*, 500 F.3d 710 (8th Cir. 2007).

*Vance v. Ball State Univ.*, 570 U.S. 421 (2013) (rejecting "the nebulous definition of a 'supervisor' advocated in the EEOC guidance"). Thompson only had the ability to train Benitez. He could not hire her, fire her, discipline her, or take tangible action over her. Only the training team including the Driver Development Manager had that authority. ¶¶ 8-15. *Also see CRST*, *supra*, 679 F.3d at 684 (trainers for interstate trucking company were not "supervisors" of trainees assigned to long-haul trips; trainers could not hire, fire, promote or reassign trainees—at most, trainers dictated aspects of trainees' work experience and issued nonbinding recommendations at program's conclusion as to trainee's upgrade to full-driver status). Further, the trainers were told during TNT training that only in-house management could make decisions as to trainees. ¶¶ 17-18. *Also see Merritt v. Albemarle Corp.*, 496 F.3d 880 (8th Cir.2007) (harasser was not a supervisor—his authority was no greater than that of a "team leader"); and *Weyers v. Lear Oper. Corp.*, 359 F.3d 1049 (8th Cir. 2004) (harasser not supervisor because he lacked authority to discipline).[10]

In determining whether Prime was negligent, "the amount of time between notice of the harassment and any remedial action, the options available to the employer such as employee training sessions and disciplinary action taken against the harassers, and whether or not the measures ended the harassment," should be considered. *Jenkins v. Winter*, 540 F.3d 742, 749 (8th Cir. 2008) (citations omitted). And when, as here, an employer has a complaint procedure, actual notice is established when the employee notifies the individuals identified in that procedure. *Id.*

Prime trains all drivers, including trainers and trainees, as to its policies prohibiting sexual harassment, and trainers are trained three times. ¶¶ 4-5, 16-17. Prime's policies provide for multiple avenues of reporting inappropriate conduct. ¶¶ 5-6. It also has a separate training for female trainees

_____

[10] Further, any "apparent authority" Thompson had over Benitez does not make him a supervisor. *CRST*, *supra*, at 685 (employee's belief that harasser possesses supervisory authority does not alter the finding that harasser is not a supervisor); and *Cheshewalla v. Rand & Son Constr.*, 415 F.3d 847 (8th Cir. 2005) (rejecting notion that consulting with one with authority to take tangible action or appearing to victim to have "supervisory" authority makes a person a supervisor).

during which Mosley's email and personal cell phone number are provided. ¶ 6. Thompson received such training as a driver and as a trainer. ¶ 20. Benitez admits she was trained as to Prime's policies and was aware of the persons to whom she could report inappropriate conduct, including Mosley. ¶¶ 3, 7. Notably, and although Benitez refused to initially identify herself, and did not expect Mosley to respond, Mosley continued to communicate with Benitez, encouraging her to report while assuring to Benitez that her report would be confidential, and that Benitez's safety was Mosley's primary concern. ¶¶ 34-36, 38-41, 43, 46-47, And even more notably, Mosley all the while expended time and resources in an attempt to determine Benitez's identity. ¶ 37.

Moreover, the undisputed evidence, through Benitez's own testimony, establishes that Prime responded immediately once Benitez identified herself. ¶¶ 51-68. Prime, that very day, removed her from the truck, and put her in a safe location. ¶¶ 68, 71. Benitez admits that as soon as she identified herself, Prime took action to remove her from the situation. ¶ 72. Prime also paid for her room, board, and travel home, at her request, and for her "home time" while she awaited a female trainer, which was also her request. ¶¶ 77, 83, 90-91. Prime also investigated Benitez's claims, although she did not provide a statement, and terminated Thompson. ¶¶ 80, 84. Such remedial action was certainly quick, and effective, for Thompon never allegedly harassed Benitez again. *See*, *e.g.*, *Zirpel v. Toshiba Am. Info. Sys.*, 111 F.3d 80 (8th Cir.1997) (affirming summary judgment for employer where plaintiff reported harassment on a Friday, employer issued written warning on Monday warning harasser of potential for discharge, with harasser not bothering plaintiff again); and *Florida*, *supra*, 2010 WL 4220498 at *3 (suspending harasser on same day as report, in conjunction with fact that harasser never harassed plaintiff again, deemed appropriate remedial action warranting summary judgment for employer). Because Benitez cannot satisfy the fifth element, her sexual harassment claim fails on that basis as well.

## B. BENITEZ'S TITLE VII RETALIATION CLAIM FAILS

Title VII forbids retaliation. 42 U.S.C. § 2000e-3(a). But, "[t]o defeat summary judgment, [Benitez] must offer direct evidence of retaliation or create an inference of it under the *McDonnell Douglas* burden-shifting framework." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 804 (8th Cir. 2019). Because Benitez relies on indirect evidence, she bears the burden of first showing: (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) the "protected activity was a but-for cause" of the alleged adverse action. *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 888 (8th Cir. 2015) (*citing Univ. of Tex. Sw. Med. Ctr. v. Nassar¸* 570 U.S. 338 (2013)). If she does so, Prime then needs to offer a legitimate, non-discriminatory reason for its action, and if it does, Benitez must show that reason is a pretext. *Id.* at 887 (citation omitted).

### 1. Benitez cannot show that her alleged protected activity was the but-for reason for the termination of her training.

"Title VII retaliation claims require proof that the desire to retaliate was the <u>but-for</u> cause of the challenged employment action." *Nassar*, *supra*, 570 U.S. at 339 (rejecting the more lenient "motivating factor" standard that applies to Title VII *discrimination* claims) (emphasis added). The "traditional principles of but-for causation....require[] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action…of the employer." *Id.* at 360. Therefore, Benitez at all times retains the ultimate burden to prove an impermissible retaliatory motive was *the* reason, not just *a* reason, for her discharge. *Id.* at 350; *also see Van Horn v. Best Buy*, 526 F.3d 1144 (8th Cir. 2008) (protected conduct must be a "determinative—not merely a motivating—factor" in the employer's decision) (citation omitted).

Benitez claims retaliation arising out of her complaints against Thompson and Aguirre and her EEOC charge. ¶¶ 144-147. Whether singularly or in conjunction, Benitez cannot show that these were <u>the</u> reason for her discharge for several reasons. First, Hilton spoke to Benitez and Aguirre during the May 22 incident and heard Benitez physically threaten Aguirre, a threat that was

very specific, but he did not hear Aguirre make such threats. ¶¶ 126, 128-129. Walker spoke to Aguirre that evening and Agurre stated that Benitez physically threatened her, and Walker shared that information with Mosley the next morning. ¶¶ 107-109. Benitez refused to provide a statement indicating that Hilton was on the phone when everything transpired, and when Mosley obtained Hilton's statement, it confirmed the physical threats Benitez made towards Aguirre. ¶¶ 101, 121-122. Also, Aguirre's statement that she provided to Mosley confirmed the physical threats. ¶ 124.

Additionally, Benitez yelled, cursed, screamed, and hung up on each Prime employee that she spoke with that evening, actions of which she admits. ¶¶ 105-106, 110-115. Tassin found the manner in which Benitez dealt with dispatch that evening very unacceptable. ¶ 133. Benitez also readily admits that she made the physically threatening statements to Aguirre including threatening to kick Aguirre in the chest and ass. ¶ 99. Tassin found that threatening behavior towards another driver extreme and dangerous. ¶ 133. Moreover, Benitez concedes that such conduct by her was a policy violation warranting termination. ¶ 100.

In sum, Benitez cannot rebut that she was terminated, at least in part, for making physical threats against her female trainer, and this is particularly true given that Benitez admits to all of the conduct resulting in her termination including her physical threats towards Aguirre and her refusal to respond to Prime's requests for information. ¶¶ 130-134. Because there is no evidence that Prime would not have taken the same action in terminating Benitez's training "but-for" her engaging in alleged protected activity, her retaliation claim fails as a matter of law. *See, e.g., Shirrell, supra,* 793 F.3d at 888 (district court did not err in granting summary judgment to employer; under "but-for" causation standard, employer terminated plaintiff "for disciplinary reasons, rather than in response to [plaintiff's] complaints about [alleged discriminatory] remark").

**2. Even if Benitez established her prima face case, which Prime denies, Prime meets its burden of articulating a legitimate, nonretaliatory reason for its actions under the second step of *McDonnell Douglas*.**

When offering the reasoning for its actions in terminating Benitez's training, the "burden [on Prime] is one of production, not persuasion; it 'can involve no credibility assessment.' " *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 142 (2000) (citation omitted). And Prime's "burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Banford v. Bd. of Regents of Univ. of Minn.*, 43 F.4th 896, 900 (8th Cir. 2022) (citation omitted). To satisfy its minimal burden, Prime need only submit evidence which, taken as true, permits the conclusion that there was a nondiscriminatory reason for its action. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

Under this relaxed standard, Prime easily meets its burden of articulating a legitimate nonretaliatory reason for its actions. *See* Section III.B.1, *supra*. Physically threatening another driver is clearly a policy violation warranting termination. By engaging in those actions, Benitez certainly provided Prime with a nondiscriminatory reason for its actions. Prime has met its burden.

**3. Benitez cannot show that Prime's asserted reasons were a mere pretext for discrimination under the last step of *McDonnell Douglas*.**

Benitez can prove pretext either by showing that Prime was more likely motivated by retaliatory animus or that Prime's explanation is unworthy of credence because it has no basis in fact. *Rooney v. Rock-Tenn Conv. Co.*, 878 F.3d 1111, 1117 (8th Cir. 2018) (citation omitted). "Creating a genuine issue of material fact regarding pretext 'requires more substantial evidence[11]

---

[11] *See*, *e.g.*, *McNary v. Schreiber Foods*, 535 F.3d 765, 769 (8th Cir. 2008) (citation omitted) ("To prove pretext, the employee must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has offered a 'phony excuse.' "). This is because the "employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 977 (8th Cir. 2012) (citation omitted).

than it takes to make a prima facie case because unlike evidence establishing a prima facie case, evidence of pretext and retaliation is viewed in light of the employer's justification.' " *Yearns v. Koss Const. Co.*, 964 F.3d 671, 675 (8th Cir. 2020) (citation omitted).

Benitez appears to rely on the timing of her complaints and her EEOC filing to show pretext. But the Eighth Circuit requires more than a temporal connection to establish pretext:

> While a "temporal link" between the protected activity and a materially adverse employment action may be "sufficient to create an inference of retaliation," *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1105 (8th Cir.2000), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043, 1059 app. (8th Cir. 2011) (en banc), we have generally required "more than a temporal connection" to establish a retaliation claim, *Kiel v. Select Artificials, Inc*., 169 F.3d 1131, 1136 (8th Cir.1999) (en banc). *See EEOC v. Kohler Co*., 335 F.3d 766, 773 n. 7 (8th Cir. 2003) ("[T]iming alone is usually insufficient to establish that the employer's legitimate non-discriminatory reason for discharge is pretext.").

*See Wright v. St. Vincent Hlth. Sys.*, 730 F.3d 732, 738-39 (8th Cir. 2013). Because "proximity alone is insufficient to establish pretext….the timing of the discharge...in light of other evidence, or lack of other evidence, in the record" should be evaluated. *Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015) (citation omitted).

When analyzing the record as a whole, any alleged close timing is not meaningful for two primary reasons. First, Benitez told Mosley, as early as April 5, 2022, that she was engaging a lawyer. ¶ 44. Benitez reminded Mosley of that again on April 12, 2022. ¶ 76. Regardless of the fact that Prime <u>then</u> knew that Benitez was pursuing legal action against Prime, Benitez was not disciplined. In fact, she was housed while awaiting travel home (which was paid and reimbursed), she was paid while she waited to be assigned to a female trainer, and she was assigned to another trainer. ¶¶ 82-83, 90-91. If Prime had any intention of retaliating against Benitez for making a complaint or for seeking legal recourse, it certainly would not have done any of those things.

Second, Benitez's filing of an EEOC charge is irrelevant because Prime already knew she was pursuing legal recourse. Plus, Benitez did not file her EEOC charge until "after"[12] she had threatened her female trainer, making "any inference that might be drawn from timing especially weak." *See Couch v. Am. Bottling Co.,* 955 F.3d 1106, 1109 (8th Cir. 2020). Such facts are similar to those in *Couch*. That plaintiff struggled under a new supervisor and knew that his interim performance review would happen in August. So, he filed an EEOC charge at the end of July. Three days later, he received a negative review and made serious accusations against the supervisor, resulting in his termination. *Id.* at 1107. In rejecting his retaliation claim, the Eighth Circuit stated, "The short turnaround between Couch's filing of the charge and these disciplinary actions might look suspicious, but generally speaking, timing alone is not enough to establish pretext,…even if it can 'create an inference of retaliation' at step one…After all, Couch knew that his interim review would happen in August and filed his charge at the end of July." *Id.* at 1109 (citations omitted).

Similarly, here, Benitez, after engaging in an altercation with her female trainer, "could have anticipated an adverse employment action." *Id.* at 1109. By engaging in that threatening conduct "before" she filed her charge, Benitez is "not insulated from termination merely because [s]he [filed a charge]." *Gibson*, *supra*, 776 F.3d at 542 (noting employees may not protect themselves from discipline by presenting a discrimination claim "just before the employer takes action") (citation omitted). Said another way, to require Prime to overlook Benitez's actions towards her female trainer "simply because [s]he filed an EEOC complaint would unduly hamper [Prime's] right to make employment decisions." *Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1390 (8th Cir. 1988), *cert. denied*, 488 U.S. 892 (1988).

---

[12] *See Carrington v. City of Des Moines*, 481 F.3d 1046 (8th Cir. 2007) ("Indeed, complaining of discrimination in response to a charge of workplace misconduct is an abuse of the anti-retaliation remedy.").

Further, Prime was already gathering evidence supporting its ultimate termination of Benitez prior to her charge filing. Mosley already had Walker's email wherein Aguirre claimed she was physically threatened, and Mosley had already reached out to Benitez for a statement. ¶¶ 108-109, 117. Moreover, Mosley and Tassin relied on information that they received from Hilton and Walker when considering whether Benitez's conduct warranted termination, and neither Walker nor Hilton was aware of Benitez's harassment complaint or charge. ¶¶ 130, 141. And Mosley insulated herself from Benitez's attempts to posture her case and interject legal issues into the working environment. Mosley told Benitez that she could not speak with Benitez's counsel and then provided Prime's counsel's information to Benitez, and Mosley also forwarded Benitez's counsel's letter to Prime's counsel without opening that letter's attachment. ¶¶ 119, 138-139. Further, while Benitez was terminated for her physical threats, Aguirre also suffered repercussions for "screaming and cussing" with Benitez in that Aguirre was not allowed to train for a significant period of time after that incident. ¶ 137. In sum, considering the record as a whole, Benitez cannot establish pretext and her retaliation claim fails for this reason as well.

## IV.    CONCLUSION

For the reasons discussed above, Prime respectfully requests that summary judgment be granted in its favor as a matter of law as to all of Benitez's claims.

Respectfully submitted,

ELLIS ELLIS HAMMONS & JOHNSON, P.C.

By  /s/  Tina G. Fowler
      Tina G. Fowler, Mo. Bar No. 48522
      tfowler@eehjfirm.com
      Rachel A. Riso, Mo. Bar No. 57145
      rriso@eehjfirm.com
      2808 S. Ingram Mill Rd., A-104
      Springfield, Missouri 65804
      Telephone: (417) 866-5091
      Attorneys for Defendant

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 3rd day of July, 2024, I electronically filed the above and foregoing document using the Court's e-filing system which sent notification to all parties of record.

*/s/ Tina G. Fowler*
Tina G. Fowler